In the Matter of KNICKERBOCKER VILLAGE, INC., Appellant. *v.* WILLIAM E. BOYLAND et al., Constituting the Tax Commission of the City of New York, Respondents.

First Department, April 17, 1962.

*Arthur C. Fink* of counsel (*Joseph A. Weinberger* with him on the brief; *Fink, Weinberger, Levin & Gottschalk,* attorneys), for appellant.

*James J. McGowan* of counsel (*Edward J. McLaughlin* with him on the brief; *Leo A. Larkin, Corporation Counsel,* attorney), for respondents.

*Daniel M. Cohen* of counsel (*Paxton Blair* with him on the brief; *Louis J. Lefkowitz, Attorney-General*), for Commissioner of Housing of the State of New York.

*Mendel Lurie* for Boulevard Gardens Housing Corp. and another, *amici curiæ.*

McNALLY, J. This is a tax certiorari proceeding to review the assessments on premises known as Knickerbocker Village, 10–40 Monroe Street, situated at Catherine, Monroe, Market and Cherry Streets, Borough of Manhattan, for the tax years 1958–59 and 1959–60. The premises are improved with a limited dividend housing project comprising 1,593 apartments with a total of 6,031 rooms, 24 stores and one office. The project was completed on December 1, 1934 at a total cost of $9,481,069.31, of which approximately $6,232,000 represents the cost of the improvement.

The project occupies two city blocks which were merged in 1934 to form the present plot. It is irregular in shape with an east to west frontage of approximately 636′, a north to south depth of 376′, and a total ground area of 220,000 square feet, or roughly five acres.

The original monthly rental per room, including electricity, of $12.50 has been increased from time to time and in May, 1958 it became $18.545.

Petitioner was organized September 5, 1933 pursuant to the Public Housing Law (L. 1939, ch. 808). The statute expresses

the public policy to correct insanitary and substandard housing conditions and towards that end to provide public and private funds at low interest rates for the acquisition of land, the gradual demolition of substandard housing and the construction of new housing conforming with proper standards of sanitation at a cost which will enable monthly rentals within the capacity of persons of low income. Article 9 (§§ 169–193) of the statute provides for housing companies such as the petitioner.

A housing company may not acquire real property except on certification from the State Commissioner of Housing of its necessity for the public purpose defined in the statute; its right to dispose of real property is limited as to grantee and amount. Its rentals are limited as to amount and subject to approval by the Commissioner; its operation and financial transactions require similar approval. On dissolution, any surplus remaining after retirement of stock, in the event the housing company has received municipal tax exemption, is payable to the municipality. In the event of foreclosure, the judicial sale is limited to a housing company, unless the court finds interest on the bonds cannot be earned under the restrictions imposed by the statute, in which event the property is to be sold free of all statutory restrictions. The statutory restrictions also do not apply to a Government first mortgage or a first mortgage held by one under supervision of the Insurance or Banking Department, and in these circumstances a purchaser would take the property free from the restrictions.

For the first 20 years of its operation petitioner paid New York City taxes on its land but was exempt from taxes on its buildings. The exempt status of its buildings terminated prior to and they were restored to the tax rolls for the fiscal year 1956–57.

The tax years at issue in this proceeding are 1958–59 and 1959–60, in each of which years the land and improvements were assessed at $7,600,000 of which $1,700,000 is land value.

There is evidence in the record of 58 sales of comparable parcels between 1953 and 1959 at prices averaging 135% of the assessed valuations. There is also evidence that for the two fiscal years the reproduction costs, less depreciation, would have exceeded $10,000,000.

Petitioner's expert projected rentals assuming a conventional rental project under rent control and arrived at a gross rental of $1,608,000, estimated expenses of $952,500, and tentative net rent of $655,500 before allowance for vacancies. He made an allowance for vacancies of 10% of the gross rentals, or $160,800, and arrived at a net rent of $494,700, which he capitalized at 8%

indicating a value of about $6,180,000. There is no data supporting the vacancy allowance. Since real property assessments are made annually, it is more appropriate that the factors supporting a deduction for vacancies materialize before they are given effect. (*Matter of City of New York* [*Maxwell*], 15 A D 2d 153, 162–163.) If to the net estimated rental of $655,500, without giving effect to any vacancy factor, there is applied the 8% capitalization rate contended for by the petitioner, the resulting value is $8,193,750, which is in excess of the assessments.

Respondents' expert projected a rent roll assuming no rent control which introduced a greater likelihood of vacancies estimated by him at 2½%. If to the tentative rental estimated by petitioner's expert there is applied a vacancy factor of 2½%, the net income is reduced to about $615,300, and this sum capitalized at 8% also supports a valuation in excess of the assessed values.

Capitalization at the rate of 8% applied to net rents subject to rent control as projected by petitioner's expert with the vacancy factor eliminated or reduced to 2½% results in a valuation substantially less than the uncontradicted reproduction cost less depreciation estimated to be in excess of $10,000,000. The reproduction cost less depreciation represents the maximum assessment absent special circumstances. (*Matter of 860 Fifth Ave. Corp.* v. *Tax Comm. of City of N. Y.*, 8 N Y 2d 29, 30.)

Petitioner's principal contention rests on the provisions of the Public Housing Law (§ 179, subd. 2) limiting the sale of the property. The statute is as follows:

" § 179. Limitations.

" No housing company shall:

\* \* \*

" 2. Sell, transfer or assign any real property (a) except to a municipality wherein a project is to be located, for public purposes only and upon such terms and conditions, with or without compensation, as the commissioner may approve, or except to another housing company formed under this chapter, and (b) without first having obtained the consent of the commissioner, and (c) except for a price not in excess of the cost of the said property less any amounts paid in amortization of the mortgage indebtedness and the retirement or redemption of stock, plus so much of the limited dividends on the stock of the said housing company from date of issue as shall have been unpaid, and accrued interest on the mortgage indebtedness and income debenture certificates."

Petitioner computes the statutory maximum selling price as of January 25, 1958 at $6,329,238, and as of January 25, 1959 at $6,193,238. Petitioner argues further that the amounts paid to retire debenture certificates serve to reduce the statutory sales price on the respective dates to $5,550,838 and $5,396,038. In regard to the last contention it need only be observed that subdivision 2 of section 179 does not mandate a deduction for retired debentures in arriving at the maximum sales price.

Section 306 of the Real Property Tax Law provides: " All real property in each assessing unit shall be assessed at the full value thereof.'' Petitioner equates the statutory maximum sales price of its real property with the section 306 " full value " and maintains it may not exceed the maximum statutory sales price. A necessary corollary is that the permissible assessed value of petitioner's real property is subject to variation inversely to its profits. This follows because as petitioner's profits increase more can be applied to amortization and stock redemption with a consequent lowering of the statutory maximum sales price; conversely, if there are no profits, amortization and redemption are precluded and a higher statutory maximum sales price results. Stated differently, the base for the imposition of the tax is enlarged as the petitioner's capacity to amortize and redeem is reduced. Implicit also in petitioner's claim is that the statutory maximum sales price effects a progressively increased tax exemption as the total of mortgage amortiaztion and stock redemption increases.

Petitioner suggests its real property is subject to certain statutory restrictions and burdens, akin to easements, adversely affecting its market price, citing *People ex rel. Poor* v. *Wells* (139 App. Div. 83, affd. 200 N. Y. 518) and *Matter of Crane-Berkley Corp.* v. *Lavis* (238 App. Div. 124). An easement lessens the value of the servient estate and enlarges the value of the dominant estate. The assessment on the former is reduced and the assessment on the latter increased by the value of the easement. (*Tax Lien Co.* v. *Schultze,* 213 N. Y. 9; *People ex rel. Poor* v. *Wells, supra.*) It has not been held, however, that restrictions personal to the owner and which do not attach to or run with the land need be given effect in the assessment.

The statutory sales price limitation operates against and is personal to housing companies like the petitioner; it is not effective if a foreclosure sale free of such restriction be directed by the court as provided in subdivision 1 of section 191 of the Public Housing Law, or if the sale results from a foreclosure by a mortgagee subject to supervision of the Insurance or Banking

Department as provided in subdivision 2 of the same section. The personal nature of the disabilities relied on serve to demonstrate they are not in the category of easements required to be carved from the real property in the process of assessment.

The statute (Real Property Tax Law, § 306) requires " real property * * * shall be assessed at the full value thereof ". The Administrative Code of the City of New York (§ 158–1.0, subd. b) provides: " The assessed valuation of each such parcel shall be set down * * * in two columns. In the first column shall be stated * * * the sum for which such parcel would sell under ordinary circumstances if wholly unimproved; and in the second column, the sum for which such parcel would sell under ordinary circumstances with the improvements, if any thereon." It is to be noted the pertinent statutes have to do with the assessment of land and improvements without reference to the identity, nature or extent of the ownership thereof. What is to be assessed is the whole of the property and the full value thereof regardless of restrictions personal to the owner. The resulting tax is on the real property; its consequence falls upon the owner whose personal disabilities and restraints neither lessen nor increase the amount. (*Paddell* v. *City of New York*, 50 Misc. 422, 424–425, affd. 114 App. Div. 911, affd. 187 N. Y. 552, affd. 211 U. S. 446.)

The restrictions upon its sale of the real property result solely from petitioner's ownership. The restrictions were voluntarily assumed and to a large extent induced by the advantage of a 20-year exemption in respect of the improvement. The cost of the improvement, $6,232,000, which is greater than the assessments attributable to it, reflects the petitioner's evaluation of the tax exemption. The evidence is that the reproduction value is in excess of the original cost. The higher costs of reproduction since the erection of the improvement indicate that no adjustment of petitioner's evaluation of the tax benefit is indicated by reason of the intervening lapse of time. Time in this instance has greatly favored petitioner.

Moreover, petitioner's view implies a continuing and progressively increasing exemption which will not in the circumstances be indulged. (*Matter of Young* v. *Bragalini*, 3 N Y 2d 602; *People* v. *Brooklyn Garden Apts.*, 283 N. Y. 373.) This is particularly so where, as here, petitioner has been the beneficiary of a specific 20-year exemption by virtue of the improvement which is the subject of the assessments.

On this record the order should be affirmed, with costs to respondents.

STEUER, J. (concurring). I concur on the ground that, under the facts as stated in both opinions, a 6% capitalization rate would be applicable in this case. If so applied on either of the net rentals found to be proper, the assessment should be confirmed.

BREITEL, J. P. (dissenting). The problem of valuing for real estate tax purposes the land and buildings of a limited dividend housing project is unique since neither the housing nor the tax statutes expressly supply a standard for the special situation. Because tax exemption for the increment in value attributable to the improvements was provided for a limited number of years, and the exemption in the present case has only recently expired, the question of value is one of first impression in an appellate court in this State.

The property consists of multiple dwellings, the several apartments being let for rent. By law the net return to stockholders is limited to 6%, and the property may be sold only to specified public or regulated entities at a computed declining price representing the amortized original investment. The rents are fixed by public authority and may not exceed the amount sufficient to cover specified costs and the limited return on equity investment. There are many other restrictions and limitations on the operation of such projects, making their "market value" indeterminable and, at best, an unreliable, fictional reconstruction (Public Housing Law, § 169 et seq.*).

In the case of income-producing properties held for income, the actual income, in the absence of special circumstances indicating otherwise, is the most significant or even the decisive factor in determining the capital value of the property. This is because the market, with respect to income property, determines the price on the expectation of income. Taxpayer relies on the actual income as the base for determining the value of its property and for reasons which will appear urges that the proper rate of capitalization to be applied to the property's income is 8%. Using its records of actual income and expenses for the years 1956 through 1958, petitioner taxpayer computed an estimated net income for a balanced one-year period of $423,688. The city, eliminating certain expenses, computed the actual net income for 1957 at $462,361.32 and for 1958 at $497,896.41, giving an average of approximately $480,000.

---

* Effective March 1, 1962 is a new Private Housing Finance Law into which is consolidated various limited profit housing legislation, including the relevant article affecting the property in this case. See Private Housing Finance Law, § 70 et seq.

The provision of the Tax Law which is indiscriminately applicable to all classes of real property provides "All real property in each assessing unit shall be assessed at the full value thereof" (Real Property Tax Law, § 306). Generally, full value means market value, and market value is defined as the price which a willing purchaser will pay to a willing vendor in an open market under ordinary circumstances (*People ex rel. Parklin Operating Corp.* v. *Miller*, 287 N. Y. 126, 129; see 1 Bonbright, Valuation of Property, pp. 461–462). Fair enough, for such real property as may be marketed. The property in question, however, may not be marketed in the customary sense; it may only be sold to specified public or regulated entities at a limited price (Public Housing Law, § 179, subd. 2). Consequently, in the case of this property full value is not market value because it cannot have a "market" value. Nevertheless, the statutes require that the full value be determined and, of course, such full value should represent the economic value, with attention to factors related to the burden that the property should fairly bear in supporting the municipal services from which it benefits.

The only issue is the value of the improvements. Taxpayer has not questioned the $1,700,000 assessment upon the land alone. Incidentally, throughout the life of this project taxes have been paid on the land, that is, for the past two decades. The evidence of 58 sales of "comparable parcels" at prices averaging 135% of their assessed valuation was founded upon a computation of square-foot values for land alone. The city concedes that the trial court virtually ignored this evidence, and its relevancy to the value of the improvements is obviously remote at best.

The 6% return provided in the statute for stockholders of limited dividend housing companies is quite irrelevant. It is not a return on total or original cost but on the residual equity or investment of the stockholders (Public Housing Law, § 173). It is no more relevant than the 5% limit on the mortgage return fixed in the old statute, even though the housing project was authorized to be and was, in fact, financed on a high debt-equity ratio (Public Housing Law, § 179, subd. 4, as amd. by L. 1958, ch. 958 to increase the rate to 6%).

Nor does the regulated sale price of the property as provided by statute give a basis for determining value for tax purposes (*id.* § 179, subd. 2). Not only would such a formula conceivably reach zero, although the property still retained value, but it is evident from the structure of the statute and its purpose that it was not intended that the property be sold at its economic value. The regulation of sale value was simply another restric-

tion to prevent profit in excess of original investment plus a limited return from the development of the project. So it was that the sale price was limited to the cost less amortization and retirement of stock. Of course, using the maximum sale price there would be required a substantial reduction in the assessed value. (Interestingly, if this property were to be condemned in eminent domain, arguably, the award would be limited to the cost less amortization and retirement of stock because of the very limitation on the sale price. See, 1 Orgel, Valuation Under Eminent Domain [2d ed.], § 42). These considerations merely indicate, however, that it may be dangerous and unsound to select some one of the limitation formulas contained in the statute as a basis for determining the economic value of the property.

Thus far, it would seem, that there is no disagreement in the court. The apparent disagreement, for the most part, turns on whether actual or a fictional reconstructed income should determine the base to which the rate of capitalization should be applied, and, perhaps, if the actual income were utilized, what the proper rate of capitalization should be.

Thus, it is said that the restrictions upon the property result solely from the taxpayer's ownership. That such is not the case is evidenced by the fact that the property may not be sold except to another housing company, formed under the same provisions of the Public Housing Law and subject to the same regulation, or to a municipality. It is expressly provided that sale to another housing company is subject to approval by the Commissioner of Housing, and his consent may not be given unless the purchasing company agrees to be bound by the statutory restrictions and the project is one which can be successfully operated under such provisions (Public Housing Law, § 187).

True, the 6% limited dividend is a restriction on the owner, but there is also direct regulation of the income the property may " throw off " and of the price at which it may be sold. These are restrictions on the property and not on the owner — and th restrictions " run " with the land if that be the test. Pu, another way, this case does not involve a valuation of the stock (which, incidentally, may be sold at *any* price if someone would only pay *any* price for it) as distinguished from a valuation of the real property owned by the taxpayer.

The restrictions here are a far cry from the mortgage debt owed by the taxpayer in *Paddell* v. *City of New York* (50 Misc. 422, affd. 114 App. Div. 911, affd. 187 N. Y. 552, affd. 211 U. S. 446), which was held to be a personal obligation and therefore

not deductible from total taxable value of the real property. In contrast, the restrictions here are rigorous limitations, in the classic real property sense, on the estate held by the owner. Moreover, they are all but never removable, even if unlimited moneys are available to the owner for that purpose (compare the situation with projects like Stuyvesant Town, discussed later).

The remote possibility of freeing the property from restrictions by mortgage foreclosure offers even greater evidence of the burden on the property as contrasted with the owner. In this event, of necessity, the property would be a financial failure (hence, worth less than ever), and yet the restrictions are removable only on the basis of the very special findings the court must make, before decreeing a sale of the unrestricted fee, or the property must be supervised by a State agency (Public Housing Law, § 191). In other words, even in financial liquidation, the property carries its burden of restrictions, long after the '' owner '' has lost all the value in its equity, and even its title.

Concededly, factors which might influence the value of real property under hypothetical circumstances should not affect annual tax assessments unless the factors have materialized. Thus, the present housing shortage in New York City and the great attraction of low-rent housing projects serve to preclude a vacancy allowance in estimating income. Precisely the same factors virtually guarantee the solvency of taxpayer, and the prospect of mortgage foreclosure is all but chimerical.

The problem, therefore, in this case is to determine the economic value of a restricted, regulated asset with a limited net return. If, as is the case, prime multiple dwelling properties selling in the unrestricted (except for rent control) market are entitled to a return of 6 to 6½% on full value, then it is evident that a restricted property must be capitalized at a higher rate. In the case of multiple dwellings sold in the market, the investor expects well over 6% on his equity investment, and usually receives it. Concededly, there are no precedents to help fix a value which would reflect the limitations of net income available to investors and the rigorous restrictions on sale of the property. The evidence offered by petitioner taxpayer was that 8% would represent a fair over-all capitalization rate for property restricted and encumbered by regulation as is this property. In the absence of persuasive proof or argument that the 8% rate is unsound, it ought to be accepted.

The methods of valuation by the city, Special Term, and by the majority in this court, are not clearly in accord. The city

apparently prefers capitalization of hypothetical net income of roughly $900,000 assuming the absence of statutory controls on rents (evidently all statutory rent controls including general rent controls) and using capitalization rates for the two years involved of 5¼ and 5½% for the land and 8.02 and 8.14% for the buildings. The over-all rates, using this method, amount to 7.56 and 7.68% and the building value arrived at was approximately $9,900,000. Of course, a number of alternative methods of valuation were employed by both sides, but have obviously been rejected by the trial court and this entire court.

There is no disagreement with rejection of these formulas. Thus, it is quite irrelevant that reproduction cost, less depreciation, exceeds either the assessed valuation or taxpayer's valuation. The reproduction cost is not seriously urged by anyone as reflecting true value. So too, in submitting an alternative computation based on hypothetical net rent of $655,000, which might be earned if the project were free of statutory regulation, taxpayer by no means urged a valuation based upon such theory. Indeed, it expressly asserted that the method established an upper limit on the assessment and did not reflect the true value of the regulated property. The same may be said for the city's reproduction cost approach. In short, that approach was never and is not now an issue in the case. It would seem, as noted earlier, that but one principal disagreement survives. This is whether actual income of the regulated limited property should be used, as against using the fictional reconstructed income of the same property, assumed to be free from all statutory controls, general and special, applied to housing rentals.

Realistically, any increase in the taxes owed by this property will be borne by the tenants in the way of increases in their rents required by the statute in order that the income satisfy all proper costs. This, of course, is, by itself, no argument against an appropriate increase, especially when one considers the benefits received by this property from the rendition of municipal services and that the markedly low level of rents is sustainable only because of tax exemptions granted by the municipality and by the State in projects of this kind (Public Housing Law, § 190). However, the tenants were intended to receive the benefits of these tax exemptions, and a recoupment of these benefits, even in part, should not be permitted by an increase in taxes not justified by the Tax Law standard of "full value".

In summary: Because this property involves a special situation and market value is not available the court is obliged to

select from among tenable analogies the most appropriate. For the reasons already discussed the regulated sale price is hardly appropriate. The limited return to stockholders is least appropriate. Nor is this property a "specialty" in the classic case, and, therefore, the reproduction cost basis for determining value is concededly not appropriate. An analogy might be made to the fixing of the rate of capitalization for public utilities. But for obvious reasons related to the broad public purpose of a franchise and the permanency of utility services it is not close enough. The closest analogy would seem to be that of other multiple dwellings in the market. But, as pointed out, the restrictions on net return, the regulation of tenancies, and especially the limitations on sale require an evaluation which, in turn, must be reflected in the total economic value. These restrictions and limitations are not sufficiently offset by the special desirability of apartments in a limited-rent project such as this, albeit such special desirability negates the inclusion of any rate for vacancy of apartments. On no view, is anything but the actual net return a proper base for computing capital value. A reconstructed projection of a nonexistent but similar property is only an unreal substitute for the real asset to be valued at "full value".

Finally, in the statutes there is a striking example which bears out the view that restrictions affecting limited dividend housing have a palpable economic value. Thus, in the law applicable to some projects, such as Stuyvesant Town, there are relevant provisions governing the removal of the restrictions. The provisions of the Redevelopment Companies Law permit the owner corporation of a housing project built under that law to avoid future regulation of profit, and other restrictions similar to those of the Public Housing Law, by paying all of the taxes for which exemption has been granted (L. 1942, ch. 845, §§ 24, 26, as last amd. by L. 1947, ch. 840; now Private Housing Finance Law, §§ 123, 125; see *Matter of Murray* v. *La Guardia,* 291 N. Y. 320). Such provisions make it clear that the regulation and restrictions have a significant effect on the economic value of the project, and, indeed, a limited price is fixed for their removal (compare, also, to similar effect, Public Housing Law, § 322).

Consequently, the order should be reversed as a matter of law and the assessment reduced to the full value computed on an 8% rate of capitalization on the actual net return. If the city's estimate of net return of roughly $480,000 is accepted, then the assessed valuation total should be roundly $6,000,000. If, on the other hand, the eliminations from the property's actual expenses computed by the city's experts are improper,

then the net return of approximately $420,000 would require that the assessment be reduced to approximately $5,250,000.

Accordingly, I dissent and vote to reverse the order dismissing the petition and would grant a reduction of the assessment capitalizing the actual net return at 8%, with costs to petitioner-appellant.

STEVENS and BERGAN, JJ., concur with McNALLY, J.; STEUER, J., concurs in a memorandum; BREITEL, J. P., dissents in opinion.

Order entered on December 20, 1960, affirmed with $20 costs and disbursements to respondents.